UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| MARTIN A. BIEGLER | * | CIV 11-3010-RAL |
| CARA M. BIEGLER, | * | |
| and CHRISTINE K. SCHIRBER, IRA, | * | |
| by and through its Trustee, BankWest, | * | |
| Inc., | * | |
| | * | OPINION AND ORDER |
| Plaintiffs, | * | GRANTING IN PART AND |
| | * | DENYING IN PART MOTION |
| vs. | * | FOR SUMMARY JUDGMENT |
| | * | |
| RICHARD KRAFT | * | |
| and CARYN R. KRAFT, | * | |
| | * | |
| Defendants. | * | |

Plaintiffs Martin A. Biegler, Cara M. Biegler, and Christine K. Schirber, IRA, by and

through its Trustee, BankWest, Inc., (collectively "Bieglers") sued Defendants Richard Kraft and

Caryn R. Kraft ("Krafts") seeking specific performance of what the Bieglers allege to be a

contract for the purchase of 314 acres in Dewey County, South Dakota. The Bieglers started this

case by filing a complaint and a lis pendens on May 26, 2011. The Krafts answered and denied

that there was an enforceable contract. The Krafts also filed a counterclaim for slander of title

due to the filing of the lis pendens. After discovery in this case, the Krafts filed a motion for

summary judgment, which this Court grants in part and denies in part through this Opinion and

Order.

## I. Facts in light most favorable to Bieglers

There are relatively few genuine issues of material fact in this case. In ruling on the

motion for summary judgment filed by the Krafts, this Court at this stage must resolve genuine

disputes as to any material fact in favor of the Bieglers. See Fed. R. Civ. P. 56. Thus, the Court

takes the facts primarily from the Plaintiffs' response to Defendants' Statement of Material Facts and Plaintiffs' Statement of Additional Material Facts. Doc. 38.[1]

The Bieglers are South Dakota residents. The Krafts previously lived in South Dakota, but were Alaska residents at the time of the start of this lawsuit and presently. More than $75,000 is legitimately at stake, triggering diversity jurisdiction under 28 U.S.C. § 1332.

Defendant Caryn Kraft is the record owner of a 314-acre farm and ranch containing a house and other buildings located in Dewey County, South Dakota. Doc. 38 at 6-7, ¶ 1. Caryn Kraft is married to Defendant Richard Kraft. The Krafts decided that they wished to sell the 314 acres, including the house and buildings, and chose to do so through an auction process in 2011. Doc. 35 at 1; Doc. 38 at 1, ¶ 1; Doc. 38 at 7, ¶ 3. The Krafts hired attorney Steve Aberle of the Aberle & Aberle Law Office of Timber Lake, South Dakota, to handle the sale of the property. Doc. 38 at 7, ¶ 4.

The Krafts provided information about the land and auction through what the Bieglers call a "sale bill," published in newspapers, on flyers, and on a website. Doc. 38 at 7, ¶ 5; Doc. 36-3. The sale bill described a two-phase auction process. In the first phase, bidders were to submit sealed bids with "land sale" marked on the outside of the envelope to the Aberle & Aberle Law Office on or before a May 3, 2011 deadline. Doc. 36-3. The top three bidders then would be notified and allowed to participate in a second phase of bidding at the Aberle & Aberle Law

---

[1] The Bieglers in Document 38, labeled their response to the Defendants' Statement of Material Facts as Paragraphs 1 through 32, and then labeled their Statement of Additional Material Facts as Paragraphs 1 through 74. To make clear what paragraph is referenced, this Court cites both to the page number and to the paragraph number referring to Document 38. During oral argument, counsel agreed on certain additional facts.

Office. The sale bill specified that the winning bidder must post a "fifteen percent non-refundable deposit of earnest money" upon acceptance of the bid. The sale bill also stated:

> Seller reserves the right to reject any and all bids. Any announcements made day of auction supersede any and all previously printed material and any other oral statements made.

Doc. 36-3.

The sale bill identified the land as consisting of 135 acres used for grass and grazing, and 135 acres of tilled land.[2] The sale bill described the home on the property as a 4,000 square foot, five bedroom, three-and-a-half-bath, multiple level home, surrounded by trees, and with a self-standing garage, large machinery quonset with cement floor, corrals with a barn, and two connected functioning wells. Doc. 36-3. The Krafts had not obtained an appraisal of what the value of the home was separate from the land and remaining buildings being auctioned. The bill of sale did not identify separate values assigned to any part of the land or buildings, but stated that the property "will be sold as a single unit." Doc. 36-3; Doc. 38 at 7, ¶ 7.

The Bieglers submitted a sealed bid in phase one of the auction in the amount of $397,500. Doc. 38 at 7, ¶ 8. A total of nine sealed bids were submitted for the property, and the Bieglers were the highest bidders in phase one of the auction. Doc. 38 at 8, ¶¶ 9-11.

After opening all of the sealed bids and knowing how high they were, Defendant Richard Kraft, acting on behalf of his wife, met with attorney Steve Aberle to discuss what amount of the purchase price to allocate to the value of the house. Doc. 38 at 8, ¶¶ 12-13. The amount of purchase price to be allocated to the house was important to the Krafts, because the Krafts could

---

[2] The remaining 44 acres are not identified as crop or pastureland, and would have included the trees and yard where the house and building are located.

avoid paying the 15 percent capital gains tax on gains from sale of the house, but owed a 15 percent capital gains tax on gains on any portion of the purchase price assigned to the land or other buildings. Based on the amount of the sealed bids, the Krafts and attorney Aberle chose to allocate $250,000 of the purchase price to the value of the residence in a draft purchase agreement. Doc. 38 at 8-9, ¶¶ 13-15.

The three high bidders—the Bieglers, Roger and Rita Long, and a bidder from Pennsylvania—were notified that they were entitled to return for phase two of the auction at Aberle & Aberle Law Office on May 6, 2011. The Longs and the Bieglers were the only bidders who elected to return on May 6, 2011 for phase two of the bidding. Doc. 38 at 10, ¶¶ 21-22. Richard Kraft and attorney Aberle met with the Longs and the Bieglers in attorney Aberle's conference room. Doc. 38 at 10, ¶ 26. The Bieglers and the Longs were provided, for the first time, with the draft purchase agreement and a commitment for title. Doc. 38 at 11, ¶ 27, and 9, ¶ 19. Attorney Aberle discussed the draft purchase agreement, commitment for title insurance, and certain other disclosure forms with the Bieglers and the Longs. Doc. 38 at 11, ¶¶ 29-30. When attorney Aberle reached the section of the draft purchase agreement that set forth the proposed allocation of $250,000 as the value of the house, Plaintiff Martin Biegler stated that there was a problem with such a substantial allocation to the value of the house. Doc. 38 at 11-12, ¶¶ 31-33. According to the Bieglers, attorney Aberle responded that the Krafts would work with the highest bidder concerning the allocation of reasonable amounts toward the house, land, and other structures, and that an allocation of value would be determined after the auction. Doc. 38 at 12, ¶¶ 34-35. The Bieglers believed that allocating $250,000 as the value of the house was excessive, could trigger scrutiny from the Internal Revenue Service, would result in an abnormally low price per acre, and could have negative tax consequences for the Bieglers. Doc.

4

38 at 13, ¶ 38.  Based on attorney Aberle's alleged statement that proper allocation of the purchase price would be discussed later, the Bieglers did not discuss further the value of the home before proceeding with phase two of the auction.

Before the bidding in phase two of the auction began, everyone understood that any increase in a bid would have to be by at least $2,500.  Doc. 38 at 13, ¶ 39.  Attorney Aberle, as an agent for the Krafts, acted as the auctioneer, beginning the phase two auction by stating, "we would start the bidding now for the Richard Kraft place."  Doc. 38 at 13, ¶¶ 40-41.  Attorney Aberle announced that the Bieglers had the high bid of $397,500 from phase one of the auction and told the Longs that they would need to increase their bid to at least $400,000.  Doc. 38 at 13, ¶ 42.  The Longs chose to bid $400,000.  Doc. 38 at 13, ¶ 43.  The Bieglers then bid $410,000. Doc. 38 at 14, ¶ 44.  The Longs declined to increase their bid further, congratulated the Bieglers on winning the auction, and then left attorney Aberle's office.  Doc. 38 at 14, ¶¶ 45, 49-50. According to the Bieglers, attorney Aberle declared the auction ended with the Bieglers being the high bidders.  Doc. 38 at 14, ¶ 49.

Plaintiff Martin Biegler then calculated by hand the amount of earnest money that would need to be remitted—15 percent of $410,000 being $61,500.00.  Attorney Aberle agreed with that calculation.  Doc. 38 at 15, ¶ 51.  The Bieglers then directed BankWest, Inc. to commence wiring a portion of the earnest money—$41,000—to Aberle & Aberle Law Office's trust account. Id.; Doc. 39-4.  The Bieglers had intended to write a check for the remaining $20,500 of the earnest money.  Doc. 38 at 17, ¶ 62.  The parties went through the draft purchase agreement, and attorney Aberle took notes where certain provisions would be or needed to be changed.  As the discussions were winding down, Defendant Richard Kraft observed that there was nothing left for him to do and he started to leave.  Doc. 38 at 16, ¶ 54.  At that point, Plaintiff Martin Biegler

5

raised the issue of the allocation of $250,000 of the purchase price to the house as the remaining issue. Doc. 38 at 16, ¶ 55.

Attorney Aberle and Richard Kraft told the Bieglers that the allocation of $250,000 of the purchase price as the value of the house was to benefit the Krafts for purposes of federal income tax and allegedly said that the allocation was non-negotiable. Doc. 38 at 16, ¶ 57. After the Bieglers suggested allocating $130,000 of the purchase price to the house, attorney Aberle and Richard Kraft separately met. Doc. 38 at 16-17, ¶ 58. Upon returning to the conference room, attorney Aberle said that the amount of the purchase price allocated to the home could be reduced to $130,000, if the Bieglers would pay the Krafts $18,000 more to cover an increase in the capital gains tax that the Krafts would then owe. Id. The Bieglers rejected this proposal. Doc. 38 at 17, ¶ 59. The Bieglers suggested that the parties could have the house appraised and use that amount, but the Krafts did not accept that proposal. Doc. 38 at 17, ¶ 60. Defendant Richard Kraft then refused to accept the separate check for the remainder of the earnest money, stating that the Bieglers' bid had not been accepted. Doc. 38 at 17, ¶ 62. The Bieglers had to leave for Brookings, South Dakota, because the son of Martin and Cara Biegler was graduating from South Dakota State University. Doc. 38 at 17-18, ¶ 63. The meeting ended with attorney Aberle telling the Bieglers that he would email them a written proposal concerning the remaining issue of the valuation of the house.[3] Doc. 38 at 18, ¶ 64.

---

[3] Neither the Bieglers nor the Krafts have filed any material, appraisal, or report regarding the value of the home versus the rest of the property. The bill of sale advertised the property as consisting of 135 acres of pasture and 135 acres of tilled land. The United States Department of Agriculture publishes South Dakota County Level Land Rents and Values, but the most recent such publication listing county-by-county land values is for 2008. www.nass.usda.gov/Statistics_by_State/South_Dakota/Publications/Cash_Rents_and_Land_Values /Pub/rent0804.pdf (last visited July 16, 2012). According to that report, the average per acre sale price for Dewey County land in 2008 was $267 for pastureland and $406 for crop land. Those

On their way to Brookings, the Bieglers stopped at a Mobridge accounting firm named Cahill Bauer & Associates, LLC, which happened to be the accounting firm for both the Bieglers and the Krafts, to talk with the Bieglers' accountant on how the valuation issue might be resolved. Doc. 38 at 18, ¶¶ 66-67. A different accountant from Cahill Bauer & Associates, LLC notified Defendant Richard Kraft of the Bieglers' visit. Doc. 38 at 18, ¶ 68. The parties differ over what then occurred. The Bieglers believe that Richard Kraft became upset in the mistaken belief that the Bieglers were prying into the Krafts' financial affairs; the Krafts assert that a subsequent threatening call placed by Martin Biegler resulted in termination of negotiations over the valuation of the home. Doc. 38 at 18-19, ¶¶ 68-70; Doc. 8, ¶ 11. The Krafts instructed attorney Aberle not to negotiate further with the Bieglers over the valuation of the home, and the Bieglers reversed the $41,000 partial earnest money payment that had been wired to attorney Aberle's trust account. Doc. 38 at 18, ¶ 65.

Around the time that this lawsuit was started, the Krafts entered into a purchase agreement with their nephew, Tyrone Kraft, to sell the property to him for $375,000, with the value of the home being contemplated at $234,000.[4] Doc. 38 at 19-20, ¶¶ 72, 74. The purchase agreement entered into between the Krafts and their nephew contained the following provision:

> The parties to this agreement specifically acknowledge that a threat of litigation has been made by Martin Biegler to force [the Krafts] to sell the above described property to Martin and Cara

---

values may or may not be appropriate for the land in question as the quality of land varies widely in Dewey County based on location, soil, and accessibility. This land was closer to Timber Lake in an area where one would expect land to sell for at least the county average. Agricultural land values in South Dakota also have trended upward since 2008.

[4] The reduction in the value of the home from $250,000 to $234,000 was done on close to what is a prorated basis. That is, when the Krafts selected $250,000 as the value of the home, the high bid was $397,500. The nephew's purchase price is approximately 6.5 percent below that. The reduction of home value from $250,000 to $234,000 is a reduction of approximately 6.5 percent.

> Biegler and the self-directed IRA of Kristi Schirber (hereinafter referred to as "Bieglers"). The parties to this agreement have decided to proceed with this sale based upon the agreement of the parties that [the Krafts] shall have the right to repurchase this property from [Tyrone Kraft] for the original purchase price in the event specific performance is ordered by a court of competent jurisdiction or if it appears that monetary damages may be granted to Bieglers.

Doc. 38 at 19, ¶ 73. The Krafts explain that the lower purchase price was an amount that Tyrone Kraft was willing to pay and that they desired to sell their property for less to a family member rather than to the Bieglers. Doc. 38 at 20, ¶ 74.

## II. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Rule 1 of the Federal Rules of Civil Procedure). On summary judgment, courts view "the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." E.E.O.C. v. CRST Van Expedited, Inc., 679 F.3d 657, 686 (8th Cir. 2012) (quoting Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011)). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012).

## III. South Dakota Statute of Frauds

### A. Application of SDCL 53-8-2

8

All parties agree that South Dakota law governs this diversity jurisdiction case, which involves a dispute over sale of land within South Dakota. The Krafts contend that they are entitled to summary judgment because the South Dakota statute of frauds, SDCL 53-8-2, renders any alleged agreement to purchase the land in question to be unenforceable. SDCL 53-8-2, in relevant part, provides:

> The following contracts are not enforceable by action unless the contract or some memorandum thereof is in writing and subscribed by the party to be charged or his agent, as authorized in writing:
>
> . . .
>
> (3) An agreement for sale of real estate or an interest therein . . . However, this does not abridge the power of any court to compel specific performance of any agreement for sale of real estate in case of part performance thereof . . .

SDCL 53-8-2. The Krafts contend there is no writing containing all material terms of the proposed sale of land signed by them or their authorized agent.

The Supreme Court of South Dakota has explained what writing is necessary to satisfy this portion of the statute of frauds. In Amdahl v. Lowe, 471 N.W.2d 770 (S.D. 1991), the Supreme Court of South Dakota stated:

> The statute of frauds requires that contracts for the sale of land must not only be in writing and signed by the party who is to be charged, but the writing must contain all the material terms and conditions of the oral agreement between the parties. To satisfy the statute of frauds, a memorandum for the sale of land must describe the land, the price, and the contracting parties; it need not detail the form or delivery of deed, the time and place of payment, or any other matters. The statute of frauds requires only that the writing evidence the substance of the contract. There is no fatal ambiguity if the contract terms are sufficiently certain to make the acts required of each party clearly ascertainable.

9

Id. at 774-775 (citations omitted); see also LaMore Rest. Gp., LLC v. Akers, 2008 SD 32, ¶ 15, 748 N.W.2d 756, 761.

The "purpose of the statute is to remove uncertainty by providing written evidence of an enforceable obligation," but the statute of frauds is not to "be used to work an injustice." Jacobson v. Gulbransen, 2001 SD 33, ¶ 26, 623 N.W.2d 84, 90 (citations omitted) (internal quotation marks omitted). Accordingly, "the agreement itself need not be the writing relied upon, a memorandum evidencing the obligation is sufficient." Wiggins v. Shewmake, 374 N.W.2d 111, 114 (SD 1985) (citing SDCL 53-8-2). That is, "any memorandum that reasonably identifies the subject matter of the action and is signed by the party to be charged will satisfy the statute's writing requirement." Northstream Investments, Inc. v. 1804 Country Store Co., 2005 S.D. 61, ¶ 17, 697 N.W.2d 762, 766.

The undisputed facts establish that there is no contract or memorandum in writing signed by the Krafts. The Bieglers suggest that the Krafts' agent, attorney Steve Aberle, kept written notes, including a markup of the draft purchase agreement.[5] SDCL 53-8-2 expressly states that a contract within the scope of that provision is "not enforceable by action unless the contract or some memorandum thereof is in writing and subscribed by the party to be charged or his agent." SDCL 53-8-2. The South Dakota Supreme Court has equated the word "subscribed" with "signed." See Amdahl, 471 N.W.2d at 774 ("contracts for the sale of land must . . . be in writing and signed by the party who is to be charged"); Northstream Investments, 2005 SD 61 at ¶ 17, 697 N.W.2d at 766 (any memorandum may satisfy the statute of frauds if it "is signed by the

---

[5] These have not been produced in discovery and apparently were discarded. These notes were not signed by either the Bieglers or the Krafts and were notations at least in part of how the purchase agreement would need to be revised.

party to be charged"). In today's electronic world, there may be ways of satisfying the requirement of a contract to be "subscribed," other than by an actual physical signature. However, although there was a written contract under negotiation that would have satisfied the statute of frauds, neither the Krafts nor their agent signed that purchase agreement or any other such writing.

The Bieglers nevertheless contend that the documents surrounding the two-phase auction—the bill of sale advertising the auction, information of a similar nature on a website, and ultimately the proposed and unsigned purchase agreement—satisfy the writing requirement. This material, particularly with notations that attorney Aberle apparently made on the draft purchase agreement after the auction, identifies the land and contracting parties and other details. And there is no dispute that the high bid at phase two of the auction was $410,000, albeit with an issue remaining about how much of that purchase price would be allocated to the value of the home on the property. However, the fact that most of the terms of the proposed purchase of real estate can be pieced together from memoranda and parole statements does not satisfy the requirement of SDCL 53-8-2 that there be some writing "subscribed by the party to be charged or his agent."

The Bieglers next argue that SDCL 53-8-2(3) is satisfied because of "part performance" and the operation of promissory estoppel. SDCL 53-8-2(3) indeed recognizes that a court may compel specific performance of a real estate agreement rendered unenforceable under the statute of frauds if there is "part performance thereof." The Bieglers assert that they engaged in part performance by having a portion of the earnest money wire-transferred to the Krafts' account and negotiating for changes to the draft purchase agreement. The Bieglers also were prepared to write a check for the remainder of the earnest money, but the Krafts refused to accept such a

11

check due to the parties' disagreement over how much of the purchase price to allocate to the value of the home.

The Supreme Court of South Dakota in <u>Durkee v. Van Well</u>, 2002 SD 150, 654 N.W.2d 807, considered what conduct amounted to "part performance" under SDCL 53-8-2(3). In <u>Durkee</u>, the Van Wells acquired property in 1975 adjacent to property owned by the Durkees. Through a survey completed prior to the purchase of the property, the Van Wells learned that a boundary fence between the two properties was located 35 feet off of the actual boundary line to the benefit of the Durkees. The Van Wells discussed the situation with the Durkees, and the Van Wells and Durkees reached an oral agreement. Under the oral agreement, the Durkees would be allowed to continue use of the strip of property on their side of the fence that was part of what the Van Wells thought they were buying, the Van Wells would pay the entire property tax for the property, and when it became necessary to replace the fence, the Van Wells would remove the old fence and place a new fence at the actual boundary with the Van Wells and Durkees splitting the cost of the new fence. <u>Id.</u> at ¶ 3, 654 N.W.2d at 810-811. In 2000, the Van Wells removed the original fence and began constructing a new fence on the surveyed property line. After the new fence was almost half done, the Durkees sued to enjoin the Van Wells from relocating the fence and asserted ownership of the disputed 35-foot strip of land by adverse possession. <u>Id.</u> at ¶¶ 4-5, 654 N.W.2d at 811. After a court trial of the case, the court concluded that both promissory estoppel and partial performance took the case out of the application of the statute of frauds. The Supreme Court of South Dakota affirmed, noting that, in reliance on the agreement, the Van Wells had partially performed by leaving the fence in its existing location, allowing the Durkees continued use of the property, maintaining the fence through the years,

12

paying property taxes for the disputed strip of land, removing the old fence, and constructing almost half of a new fence before the Durkees objected. Id. at ¶ 28, 654 N.W.2d at 816.

By contrast with Durkee, the Bieglers' alleged part performance consisted of a wire-transfer of a portion of funds, which the Bieglers themselves reversed later that same day, and negotiating certain terms of a purchase agreement, without reaching an agreement on the term regarding the amount of the purchase price to assign to the house. If an agreement for sale and purchase of the property existed between the Bieglers and the Krafts, the Bieglers' performance ultimately would consist of paying the $410,000 purchase price, and the Krafts' obligation would be to transfer the property to the Bieglers. If the Bieglers had paid the earnest money in full or not cancelled the wire transfer, and if the Krafts had retained the earnest money, this would be a different case. However, with the Bieglers having reclaimed all of the partial payment of earnest money, the doctrine of part performance does not spare the Bieglers' claims from the operation of SDCL 53-8-2(3).

The Bieglers also claim promissory estoppel. Promissory estoppel is a recognized exception to the operation of the statute of frauds, because the statute of frauds is not designed to work an injustice. Durkee, 2002 SD 150 at ¶ 21, 654 N.W.2d at 814-15; Jacobson, 2001 SD 33 at ¶¶ 25-27, 623 N.W.2d at 90-91; Matter of Estate of Gosmire, 331 N.W.2d 562, 567 (S.D. 1983). Thus, "an oral promise to convey real property is enforceable by specific performance where the grantee . . . has acted in reliance upon the promise of the grantor in such a manner that it would invoke a fraud or prejudice against the grantee not to grant specific performance thereon." Matter of Estate of Gosmire, 331 N.W.2d at 567. In Jacobson, the Supreme Court of South Dakota characterized the elements of promissory estoppel as a "promise which the promissor should reasonably expect to induce action or forbearance on the part of the promisee

or a third person and which does induce such action or forbearance." Jacobson, 2001 SD 33 at ¶ 27, 623 N.W.2d at 91 (citation omitted). Such a promise becomes binding "if injustice can be avoided only by enforcement of the promise." Id. (citation omitted).

　　The Bieglers point to the promise allegedly made just before the second phase of bidding that the Krafts would work with the successful bidder on a proper allocation of the value of the home. The facts in the light most favorable to the Bieglers are that Plaintiff Martin Biegler objected to the draft purchase agreement allocating $250,000 as the value of the home, that everyone present at the second phase of the auction realized that there was an issue concerning the proper amount to assign as the value of the home, and that attorney Aberle represented to all in front of Richard Kraft that the Krafts would work with the high bidder toward allocating a reasonable amount for the value of the house, land, and other structures following the second phase of the auction. The Bieglers assert that their bid of $410,000 was made in reliance on the promise that the Krafts would agree to a suitable allocation of portions of the purchase price for the home and the land. Under these circumstances, there is a promise—that the Krafts would work with the successful bidder on a proper allocation of the value assigned to the home and land. The promise is one that the Krafts could expect to induce action—bids in reliance on the statement. And the promise did induce a bid of $410,000 from the Bieglers. This, however, leaves open the question whether "injustice can be avoided only by enforcement of the promise" and a related question of whether an alleged breach of a promise to negotiate in good faith supports specific performance, and, if so, on what terms. See Jacobson, 2001 SD 33 at ¶ 27, 623 N.W.2d at 91.

　　This Court, on summary judgment, must view the facts in the light most favorable to the nonmoving party, the Bieglers. Promissory estoppel is in the nature of an affirmative defense

14

to the application of the statute of frauds, where it would appear that the Bieglers carry the burden of proof by a preponderance of the evidence. See 56 A.L.R.3d 1037 and 61A Am. Jur. 2d Pleading § 303. This Court cannot on the record as it is, with some dispute existing over what exactly was said or done by attorney Aberle and what transpired thereafter, conclude as a matter of law that promissory estoppel does or does not take this situation outside of the application of the statute of frauds under SDCL 53-8-2.

### B. Effect of SDCL 53-8-4

The Bieglers assert that their alleged agreement with the Krafts to buy the land is enforceable notwithstanding SDCL 53-8-2, because the sale was through an auction thereby making SDCL 53-8-4 applicable. SDCL 53-8-4 provides:

> When a sale is made by public auction of any real or personal property, an entry by the auctioneer, or actual clerk of the sale, in his sale book at the time of the sale, of the kind of property sold and description thereof sufficient for identification, the terms of sale, the price, and the names of the purchaser and person on whose account the sale was made, is a sufficient memorandum to satisfy the requirements of § 53-8-2.

SDCL 53-8-4. The Krafts were attempting to sell the land in question by a two-phase public auction with attorney Aberle serving as the auctioneer. There was no formal sale book, but a draft purchase agreement set forth most of the terms of sale, the price of $410,000 as the high bid in the second phase apparently was recorded, and the prospective purchaser was apparent. There is some uncertainty as to what notes attorney Aberle made or recorded because those appear not to be available now.

There is a dearth of authority in South Dakota on what actions during an auction are sufficient to remove a case from the statute of frauds. SDCL 57A-2-328, a provision of the

Uniform Commercial Code that applies to transactions in goods and not to real estate sales, refers to a sale by auction being complete "when the auctioneer so announces by the fall of the hammer or in some other customary manner." Although less than completely clear at this stage what attorney Aberle said, his comments following the $410,000 bid were sufficient to cause the unsuccessful bidders—the Longs—to congratulate the Bieglers and leave the building. There was no formal "fall of the hammer," but there was communication about the Bieglers having the high bid.

The Bieglers assert that, because the sale was by auction and they were the high bidder, they thereby have a binding contract without any issue under the statute of frauds. The Bieglers' argument would prevail if the Krafts had sold the property at an "absolute auction." An "absolute auction" is "an auction in which the property is sold to the highest qualified bidder with no limiting conditions or amount." S.D. Admin. R. 20:69:06:01.01(2). When there is an "absolute auction," sometimes called an "auction without reserve," the seller is making an offer to sell with no reservation or conditions, and the bid reflects acceptance of that offer. See Washburn v. Thomas, 37 P.3d 465 (Colo. App. 2001); Pyles v. Goller, 109 Md. App. 71, 82, 674 A.2d 35, 40 (Md. Ct. Spec. App. 1995); Pitchfork Ranch Co. v. Bar TL, 615 P.2d 541, 548-49 (Wyo. 1980); 7 Am. Jur. 2d Auction and Auctioneers § 17.

The Krafts, however, were not selling their property at an absolute auction. Rather, the bid sheet advertising the auction specifically stated:

> Sellers reserve the right to reject any and all bids. Any announcements made day of auction supersede any and all previously printed material and any other oral statements made.

Doc. 36-3. The Krafts thereby were offering the property through some form of an "auction with reserve," which is "an auction in which the seller or seller's representative retains the right to

16

establish a minimum price, to accept or decline any and all bids or to withdraw the property at any time prior to the announcement of the completion of the sale by the auctioneer." SD Admin. R. 20:69:06:01.01(3). Thus, the Krafts retained the right to choose not to sell the property at least up to the time of the completion of the sale by the auctioneer. See Pyles, 109 Md. App. at 81-82; 7 Am. Jur. 2d Auctions and Auctioneers § 17. Although the Uniform Commercial Code does not apply to a sale of real estate, SDCL 57A-2-328(3) codifies prevailing law in stating that an auction sale "is with reserve unless the goods are in explicit terms put up without reserve. In an auction with reserve the auctioneer may withdraw the goods at any time until he announces completion of the sale." See also Young v. Hefton, 38 Kan. App. 2d 846, 851, 173 P.3d 671, 675 (2007) (U.C.C. provision in real estate sale issue is "instructive although not technically applicable"); Pyles, 109 Md. App. at 81 ("the presumption in contract law is that auctions are held 'with reserve' unless otherwise specified"); 7 Am. Jur. 2d Auction and Auctioneers § 17. An auction with reserve is an invitation for bids, with each bid constituting an offer that may be accepted by the seller. See Young, 28 Kan. App. Ct. at 852, 173 P.3d at 676. Typically in an auction with reserve, the contract forms when the auctioneer closes the bidding, customarily by a fall of the hammer or some other recordation and notification of the high bidder of the acceptance of the bid. Id.

Some authority recognizes another type of auction, a "conditional" auction, although such an auction seems to be a type of an auction with reserve. See Restatement (Second) of Contracts § 28 and comment b. and d. (1981 & Supp. April 2012) (recognizing "auction without reserve" and "auction with reserve"). In such a "conditional auction," a seller reserves the right to accept or reject bids even after the close of bidding. Young, 28 Kan. App. 2d at 852-53, 173 P.3d at 676-77; Washburn, 37 P.3d at 467 (holding that sellers could reject a final bid after the auction

17

was closed on a real estate auction because the auction was conditional). For an auction to be conditional, "the conditions must be effectively communicated to prospective bidders." Young, 28 Kan. App. Ct. at 852, 173 P.3d at 677; see also Cuba v. Hudson & Marshall, Inc., 213 Ga. App. 639, 640, 445 S.E.2d 386 (1994); East v. Brown, 986 P.2d 523, 525 (Okla. Civ. App. 1999); Coleman v. Duncan, 540 S.W.2d 935, 937 (Mo. Ct. App. 1976). Here, just before the second phase of the auction commenced, Aberle, acting as an agent of the Krafts, made a statement to the effect that, after the bidding, there would be more negotiation of assignment of purchase price to aspects of the property. The bill of sale had disclosed that "any announcements made day of the auction supersede any and all previously printed material and any other oral statement made." Doc. 36-3.

The Krafts' auction clearly was not an absolute auction or auction without reserve; the flyer and advertisement of the auction stated, "Seller reserves the right to reject any and all bids." Doc. 36-3. At oral argument, the Bieglers ultimately argued that the auction was with reserve, but the hammer of auctioneer Aberle effectively fell rendering the Bieglers the winning bidders and that SDCL 53-8-4 and the law regarding auctions with reserve results in an enforceable contract. In an auction with reserve, "the point at which the seller legally 'accepts' the potential purchaser's bid (thus entering into a contract of sale with the bidder) is less clear." Cuba v. Resolution Trust Corp., 849 F. Supp. 793, 796 (N.D. Ga. 1994). This Court is not comfortable making that decision here on a motion for summary judgment. There exists a question of fact both over whether the auction was a conditional auction where the Krafts reserved the right to reject bids after the auction and whether, if not such a conditional auction, there was enough written or done such that SDCL 53-8-4 renders any agreement enforceable under the statute of frauds.

### C. Existence of Binding Contract

The Krafts also argue that there was no meeting of the minds on all essential terms as a matter of law. In particular, the Krafts point to what they characterize as the "price" term, which the Krafts argue to include how much of the $410,000 purchase price to allocate to the value of the home.

Under South Dakota law for a contract to exist, "there must be a meeting of the minds or mutual assent on all essential terms." Jacobson, 2001 SD 33 at ¶ 22, 623 N.W.2d at 90; Read v. McKennan Hosp., 2000 SD 66 at ¶ 23, 610 N.W.2d 782, 786. That is, if the parties leave open essential terms to negotiate in the future, then a contract is not established. Weitzel v. Sioux Valley Heart Partners, 2006 SD 45 at ¶ 23, 714 N.W.2d 884, 892; Werner v. Norwest Bank SD, N.A., 499 N.W.2d 138, 142 (S.D. 1993). Put in other words, if the parties have just an agreement to agree, contemplating negotiation in the future on an essential term, there is no enforceable contract. Weitzel, 2006 SD 45 at ¶ 23, 714 N.W.2d at 892.

The existence of a valid contract is a question of law to be determined by the court. Id. at ¶ 22, 714 N.W.2d at 892; Werner, 499 N.W.2d at 141. Consent to contract likewise is a question of law in South Dakota for the court. LaMore Rest., 2008 SD 32 at ¶ 15, 748 N.W.2d at 761. However, under South Dakota law, "whether the parties had such a meeting of the minds [to form a contract] is a question of fact." Jacobson, 2001 SD 33 at ¶ 22, 623 N.W.2d at 90; see also Behrens v. Wedmore, 2005 SD 79 at ¶ 21, 698 N.W.2d 555, 566 (whether the parties' intent and conduct established a binding agreement generally is a fact question). Whether a term of an alleged contract is essential to the parties seems to be a mixed question of law and fact. See LaMore Rest., 2008 S.D. 32, ¶ 17, 748 N.W.2d at 762 (discussing what constitutes a "material term" of a contract).

Here, the "price" term, in the sense of the overall price, was established through the bid process as $410,000. However, the parties dispute whether a related term—the amount of the purchase price to be allocated to the home—was an essential term on which the parties failed to agree. The conduct of the parties demonstrates the importance of the term, in that the Krafts wanted the Bieglers to pay $18,000 over the purchase price in order to accommodate the Bieglers' request for valuing the home at $130,000, and the Bieglers would not carry through with the purchase of the property at the price of $410,000 if the amount allocated to the residence was $250,000. If the parties had been negotiating a purchase and sale of real estate without an auction, this Court would not hesitate to find an absence of a meeting of the minds. However, in determining if a binding sale occurred through the auction process, this Court must consider what conditions, what reserve was placed on the auction, and in that context, determine if the amount of the purchase price to the home was or was not an essential term, such that failure to reach agreement on that point entitles the Krafts to summary judgment on the Bieglers' claims. Thus, this Court needs to hear evidence at trial to determine whether this is or is not a situation, like Amdahl v. Lowe, where enough exists to satisfy the statute of frauds, yet the remaining details on which the parties disagree are not "so significant that the parties cannot be said to have reached an agreement." Amdahl, 471 N.W.2d at 775.

The Bieglers' Complaint seeks specific performance, which is the remedy under South Dakota law to enforce an alleged agreement for the purchase of real property. Amdahl, 471 N.W.2d at 773; SDCL 21-9-9. Specific performance is an equitable remedy where a court trial is appropriate. Indeed, most of the cases on which the parties rely for the respective positions involved appeals from court trials. LaMore Rest., 2008 SD 32, 748 N.W.2d 756; Jacobson, 2001 SD 33, 623 N.W.2d 84; Amdahl, 471 N.W.2d 770. The Krafts have a counterclaim for slander

20

of title and are not seeking a jury trial on that claim. Even though there appear to be relatively few issues remaining for trial, those fact issues are material to the outcome of the case.

**IV. Conclusion**

Accordingly, it is hereby

ORDERED that Defendants' Motion for Summary Judgment (Doc. 33) is denied, except as it relates to the affirmative defense of part performance. It is further

ORDERED that the parties cooperate with the Court in setting a court trial on all remaining claims in the case.

Dated July 17, 2012.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

21