

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| MARTIN A. BIEGLER | * | CIV 11-3010-RAL |
| CARA M. BIEGLER, | * | |
| and CHRISTINE K. SCHIRBER, IRA, | * | |
| by and through its Trustee, BankWest, | * | |
| Inc., | * | |
| | * | |
| | * | FINDINGS OF FACT, |
| Plaintiffs, | * | CONCLUSIONS OF LAW, |
| | * | OPINION AND ORDER |
| vs. | * | |
| | * | |
| RICHARD KRAFT | * | |
| and CARYN R. KRAFT, | * | |
| | * | |
| Defendants. | * | |

Plaintiffs Martin A. Biegler, Cara M. Biegler, and Christine K. Schirber, IRA, by and

through its Trustee, BankWest, Inc., (collectively "Bieglers") sued Defendants Richard Kraft and

Caryn R. Kraft ("Krafts") seeking specific performance of what the Bieglers allege to be a contract

for the purchase of 314 acres in Dewey County, South Dakota. The Bieglers started this case by

filing a Complaint and a lis pendens on May 26, 2011. The Krafts answered, raised the statute of

frauds as a defense, and denied that there was an enforceable contract. The Krafts also filed a

counterclaim for slander of title due to the filing of the lis pendens. After discovery in this case,

the Krafts filed a motion for summary judgment, which this Court granted in part and denied in

part. Doc. 45. This Court conducted a court trial of the fact issues in this case on December 10

and 11, 2012.

## I. Findings of Fact

Plaintiffs Martin and Cara Biegler are married and live in Timber Lake, South Dakota.

Christine Schirber is the mother of Cara Biegler and has a self-directed Individual Retirement

Account (IRA) through BankWest, Inc., as Trustee. Martin Biegler is a general contractor and

carpenter from Timber Lake. He also owned and operated a tent leasing business servicing the Upper Midwest until recently when he sold that business. Martin Biegler is a capable and sophisticated businessman who was described by witnesses from both sides of this lawsuit as sometimes loud, brash, and excitable. Cara Biegler has been a teacher in the Timber Lake school district for many years. Christine Schirber is married to Walter "Bud" Schirber, and they have retired to Lead, South Dakota. Christine Schirber had a career in banking culminating in heading a bank in Timber Lake, where her husband Bud was the cashier and vice president. Each of the Plaintiffs are very intelligent and both Martin Biegler and Christine Schirber are very sophisticated in the conduct of business.

Defendants Richard and Caryn Kraft are married and have lived together in Sitka, Alaska since 2008. The Krafts previously lived just outside of Timber Lake, on a 314-acre farm/ranch. Caryn Kraft was the record owner of that property. The Krafts had purchased the property, including a five bedroom, three-and-a-half bath, 4,000-square-foot home on the property, in 1997, and had lived there until 2008. Richard Kraft is a physician who has worked for the Bureau of Indian Affairs Indian Health Services. The Krafts are very intelligent, and Richard Kraft is sophisticated in business dealings.

When the Krafts originally moved to Alaska, they had intended to return to live in their home outside of Timber Lake. However, in 2011, the Krafts decided to make Alaska their permanent home and to sell the 314-acre farm/ranch, the home, and all improvements on the land. Although Caryn Kraft was the sole record owner of the property, she chose to have her husband Richard Kraft handle the sale of the property.

The Krafts hired Timber Lake attorney Steven Aberle to represent them in the sale of their home and farm/ranch. Aberle had conducted between 50 and 100 auction sales of real estate. The

2

Krafts and Aberle put together an announcement of the auction of the property describing the land as a 314-acre farm, consisting of 135 acres used for grass or grazing, 135 tilled acres for farming, areas of trees and a large yard. Exhibit 1. The advertisement described the Kraft home as well maintained and including two custom-built rock fireplaces, oak trim, sunken living room, over 4,000 square feet, five bedrooms, three and a half baths, surrounding golden maple trees, and a driveway with a mix of oak, plum, chokecherry, and apple trees. Exhibit 1. Other buildings on the property included a large machinery quonset with a cement floor, self-standing garage, corrals with a barn, and two functioning wells. Exhibit 1. The property was to be sold as a single unit through a two-phase auction, with sealed bids to be submitted no later than 11:00 a.m. on May 3, 2011. Exhibit 1. The top three bidders then would be notified and invited back to bid in person at Aberle & Aberle Law Office on May 10, 2011. Exhibit 1. The sale announcement contained the following language: "Seller reserves the right to reject any and all bids. Any announcements made day of auction supersede any and all previously printed material and any other oral statements made." Exhibit 1.

Cara Biegler noticed an advertisement of the sale of the Kraft home and land in the local paper and informed her husband Martin Biegler. See Exhibit 2. Martin and Cara Biegler then visited a website for information on the sale. Exhibit 3. Cara Biegler desperately wanted to buy the Kraft home, because the Bieglers' existing home was in a neighborhood that had changed for the worse and a burglar had broken into the Bieglers' home leaving Cara Biegler and her daughter very unnerved. Cara Biegler saw the Kraft home location as being ideal—outside of Timber Lake, on a paved road, large enough for hosting gatherings—and considered purchase of the Kraft home as presenting a once-in-a-lifetime opportunity. Martin Biegler, familiar with the home after having re-roofed it for the Krafts in 2008, was more cautious about the home and saw problems with it,

3

including the home's construction in the early 1970s and the bathrooms and furnace being of that vintage, some single pane windows, some hail damage of the siding, floor covering in the kitchen and dining room that he would have wanted to replace, and two wood burning fireplaces that he considered to be obsolete. Martin Biegler discussed with his wife not having enough cash on hand to buy the home and land and not wanting to borrow money to finance the purchase. Meanwhile, Cara Biegler's mother, Christine Schirber, had been looking to acquire farm or ranch land to diversify her self-directed IRA and liked the prospect of acquiring the portion of the Kraft property that would be separate from the home. Christine Schirber knew that her self-directed IRA could not be used to buy a home for her daughter but could benefit from possible purchase of the agricultural land apart from the home. The Bieglers were genuinely interested in acquiring the Kraft home. In late March of 2011, the Bieglers sent a series of questions about the home to the Krafts, Exhibit 4, to which the Krafts responded. Exhibits 5, 6, 7, and 8.

The Bieglers and the Krafts knew each other and there were no ill feelings whatsoever between them at that point. Indeed, Martin Biegler and Richard Kraft were childhood friends and had graduated from Timber Lake High School in the same class. Richard Kraft had hired Martin Biegler's construction company to do work on his home. Likewise, there were no hard feelings between Aberle and the Bieglers. Aberle had hired Martin Biegler's business to do construction work on his law office as well, and both the Krafts' son and Aberle's son had worked for Biegler Construction without issue.

At the first phase of the auction, the Krafts received nine sealed bids. Exhibit 12. The top three bids were from the Bieglers, Dennis Ulrich, and Roger "Chip" and Rita Long, with the Bieglers' bid of $397,500 being the highest. Exhibits 9, 10, 11, 12. Tyrone Kraft, the nephew of the Krafts, submitted a bid which was not among the top three bids. Exhibit 12.

Aberle notified the top three bidders and invited them back to phase two of the auction scheduled for May 10, 2011, at 11:00 a.m. Dennis Ulrich, who was from Pennsylvania, told Aberle that he was not interested in bidding above the Bieglers' bid of $397,500, but remained interested in the property and would bid as high as $360,000, if the home and land could be purchased for that price. Ulrich declined to return to South Dakota to participate in phase two of the auction. The Bieglers asked Aberle to move up the time of phase two of the auction to 8:00 a.m., because Martin and Cara Biegler's son was graduating from South Dakota State University in Brookings on May 12, and they wished to drive the nearly six hours to arrive in Brookings for dinner on May 11. Aberle checked with the Krafts and Chip and Rita Long who all agreed to an 8:00 a.m. start to phase two of the auction.

In the days before phase two of the auction, Aberle met with Richard Kraft to discuss terms of a draft purchase agreement. Both Richard Kraft and Aberle were pleasantly surprised at the amount of the top bid. Richard Kraft and Aberle discussed a term of the draft purchase agreement to allocate a value of $250,000 to the residence in order to reduce the amount of capital gains tax the Krafts would owe. Both Aberle and Richard Kraft admitted at trial that if the initial bids had been lower, the value they would have allocated to the home probably would have been lower, but both Aberle and Richard Kraft felt comfortable assigning $250,000 as the value of the residence in light of the top sealed bid of $397,500. Aberle prepared a draft purchase agreement leaving blanks for the buyer's name, the amount to be paid, the amount of earnest money deposit, and the values to be assigned to other structures on the land, such as the detached two-car garage, steel shed with concrete floor and apron, pole calving barn, two wells and water line and land. Exhibit 14. However, the draft purchase agreement assigned $250,000 of the purchase price to

"residence." Exhibit 14. Neither Aberle nor the Krafts shared with the Longs or the Bieglers before the second phase of the auction the intention to assign a value of $250,000 to the residence.

Meanwhile, the Bieglers had reached a preliminary agreement among themselves that two-thirds of any purchase price would come from the self-directed IRA for land other than associated with the residence, while the remaining one-third of the purchase price bid would come from Martin and Cara Biegler for the purchase of the residence. Although BankWest, Inc., as trustee for the Christine Schirber IRA had signed the sealed bid of the Bieglers, Exhibit 9, neither Aberle nor the Krafts knew the extent of the IRA's involvement or the arrangement among the Bieglers to divide the purchase price and property, if they were the prevailing bidder.

On the night before phase two of the auction, Tyrone Kraft, who at the time was engaged to the niece of Chip and Rita Long, approached the Longs because he knew the Longs to be among the top three bidders. Tyrone Kraft, who happened to be the Krafts' nephew, wanted to buy the Kraft home and land, but had not finished among the top three bidders in phase one of the auction. The Longs told Tyrone Kraft that they might back out of the second phase of the auction. Tyrone Kraft asked the Longs to submit a bid for him instead and authorized the Longs to bid up to $405,000 for him. The Longs agreed to do so. The Bieglers, the Krafts and Aberle were unaware at the time of phase two of the auction that the Longs were submitting a bid on behalf of Tyrone Kraft.

On May 11, 2011, at 8:00 a.m., at the Aberle & Aberle Law Office in Timber Lake, the following people gathered for phase two of the auction: Richard Kraft, Aberle, Chip and Rita Long, Martin and Cara Biegler, and Christine and Bud Schirber. Craig DeJager, the trust officer with BankWest, Inc., participated in a portion of the discussions by telephone from his office in Rapid City.

Aberle then took the individuals back to a room in the rear of the building, where there was enough space for everyone to gather. Aberle provided the Longs and the Bieglers with a bid packet containing the commitment for title insurance and the draft purchase agreement. Aberle then laboriously went through the commitment for title insurance, Exhibit 15, and certain other matters concerning the sale. Aberle then went through the draft purchase agreement, Exhibit 14, reading it line-by-line. The draft purchase agreement had not been distributed to any of the bidders prior to this meeting on May 11, 2011. After Aberle read the portion of the draft purchase agreement that allocated $250,000 as the value of the residence, Martin Biegler said that he had a problem with that valuation, and Christine Schirber echoed Martin Biegler's concern.

The agreement among the Bieglers to divide the cost of acquiring the property two-thirds to the IRA and one-third to Martin and Cara Biegler was inconsistent with a valuation of $250,000 for the home. A valuation of $250,000 nearly inverted the Bieglers' internal financial arrangement; the Bieglers bid of $397,500 contemplated a value of the residence of $132,750 (one-third of the total) with the remainder being the value of the land and possibly other improvements. Christine Schirber's IRA could not be used to help purchase a home for Martin and Cara Biegler, but only to purchase land and improvements separate from the home. The Bieglers did not explain this dilemma or their circumstances to the Krafts or Aberle.

Not understanding the origin of the Bieglers' objection to valuing the home at $250,000, Aberle then discussed the open blanks for valuing the detached garage, steel shed, pole barn, and wells, and pledged that the Krafts would work with any potential purchaser in filling in those blanks. Aberle presumed that larger values for those improvements could be depreciated by a farmer to help shelter income from federal tax. Martin Biegler persisted in his concern being the value of $250,000 assigned to the home. The parties dispute the exact words used by Aberle at

this point. It appears that Aberle stopped just short of pledging to negotiate the assignment of a different value to the residence, but said enough to leave those in the room inferring that the Krafts would negotiate not only the empty blanks but also the value assigned to the residence. Ultimately, the issues surrounding the $250,000 valuation to the residence were finessed in the pre-bid discussion. Aberle declared that all parties had sufficient knowledge to proceed with phase two of the auction, and there was no further pre-bid discussion of valuation of the residence. The parties agreed that any increase in any bid for the property would be in increments of at least $2,500.

In order to use a conference phone to connect trustee Craig DeJager, all individuals at the meeting moved to the reception area at the front of Aberle & Aberle Law Office. Aberle acted as the auctioneer. Aberle announced that the high bid in phase one of the auction had been $397,500, and turned to the Longs to see whether they would bid at least $400,000. Chip Long then bid $400,000. The Bieglers briefly met separately and returned with Martin Biegler bidding $410,000. Neither the Longs' bid nor the Bieglers' bid had an express term of a certain separate value to be assigned to the residence. Aberle then turned to the Longs to ask whether they had another bid, and Chip Long said that they were done. The Longs then congratulated the Bieglers and left Aberle & Aberle Law Office. There was no actual "fall of the hammer," although some remember Aberle saying something to the effect that the auction was done or over.

Aberle, Richard Kraft, Martin and Cara Biegler, and Christine and Bud Schirber then returned to the back conference room to work through the draft purchase agreement. Martin Biegler calculated the 15 percent earnest money deposit required in the draft purchase agreement as being $61,500, of which the Bieglers contemplated $41,000 coming from the IRA and the

remainder from Martin and Cara Biegler. Christine Schirber made arrangements to have $41,000 wire transferred from her self-directed IRA to pay roughly two-thirds of the earnest money deposit.

As the discussion neared the issue of the allocation of the value to the residence, Richard Kraft, concerned about helping his wife prepare for the forthcoming auction of their personal property, stood up to excuse himself and said that there appeared to be no further reason for him to be there. At that point, Martin Biegler responded that there remained "the elephant in the room," referring to the valuation to ascribe to the residence. Either Richard Kraft or Aberle or both of them made it known that they were serious about the $250,000 valuation for the residence. Martin Biegler replied that $250,000 was not a reasonable value for the residence and that he had received an appraisal valuing the home at $125,000 to $130,000. Aberle asked Biegler to produce the appraisal. Martin Biegler responded that the appraisal was not in writing. Aberle, believing Martin Biegler to be lying, then asked who performed the unwritten appraisal. Martin Biegler refused to identify the individual.[1] Discussion became increasingly heated among Martin Biegler, Aberle, and Richard Kraft.

Bud Schirber suggested the alternative of agreeing to hire an independent appraiser to resolve the value of the residence. Although he did not voice agreement, those in the room observed that Richard Kraft seemed open to that idea. Aberle then asked to speak with Richard Kraft separately. Aberle discussed separately with Richard Kraft the tax ramifications that went with lowering the value of the residence, as the Krafts faced a 15 percent capital gains tax on the

---

[1] At trial, Martin Biegler testified that appraiser Jerry Hulm somewhat informally opined to him that the residence was worth $125,000 to $130,000, but had put nothing in writing. Mr. Hulm did not testify at trial, and indeed no party presented evidence as to the separate value of the residence and the land, other than testimony that the Court elicited through its own questioning of certain witnesses about land values in the area and the type of land the Krafts owned.

gain on the purchase of the agricultural land. Richard Kraft and Aberle agreed on a proposal to request that the Bieglers pay an amount approximating what the Krafts would face as an increase in their capital gains tax responsibility, in exchange for any reduction in the value of the residence below $250,000.

Aberle and Richard Kraft then rejoined the Bieglers. Aberle told the Bieglers that if they wanted to have a value of $130,000 assigned to the residence, then they should pay an extra $18,000[2] to cover the capital gains tax ramifications that the Krafts would experience as a result of such a lowering of the value of the residence. Martin Biegler did not respond favorably at all to the proposal. Martin Biegler, who had paid capital gains tax after selling his tent rental business and who had just had his credibility attacked over the existence of an informal appraisal, berated Richard Kraft for trying to transfer his tax responsibility to the Bieglers and told Kraft that he had to pay his own taxes because the Bieglers would not do so for him. By this time, many in the room were agitated. Christine Schirber suggested to Aberle that he provide to her by email a written proposal for how the impasse might be broken. Aberle agreed to send such an email to Christine Schirber. Cara Biegler then produced a checkbook to write the remainder of the earnest money deposit to Richard Kraft. Richard Kraft refused to accept the check, and said that no deal was in place. The Biegler group then left the office.

With Richard Kraft present, Aberle called the Longs to see if their bid of $400,000 remained in place. Chip Long, who answered the phone, told Aberle and Richard Kraft that he would check and call back. When Chip Long called back shortly afterwards, he told Aberle and Richard Kraft for the first time that he had been bidding on behalf of Tyrone Kraft, the nephew of

---

[2] This number represents the difference between $250,000 and $130,000 times the 15 percent capital gains tax rate.

Richard Kraft, and that the $400,000 bid was still in place. Richard Kraft then left Aberle's office to help his wife with the personal property at the home.

Meanwhile, the Bieglers were driving to Brookings on a route that took them through Mobridge, South Dakota. The Bieglers had long used the Mobridge accounting firm of Cahill, Bauer & Associates. The Bieglers stopped at that firm and asked for their accountant, who was not available. They instead met with accountant Jason Hatzenbuhler and asked Hatzenbuhler what the IRS rules were concerning allocation of a portion of a purchase price to a home in connection with reducing capital gains tax exposure. Hatzenbuhler advised that $250,000 is the maximum that the IRS at that time exempted per person for a personal residence from the application of the capital gains tax. Coincidentally, the Krafts likewise used Cahill, Bauer & Associates of Mobridge as their accounting firm. Hatzenbuhler told Jessica Whitlock, one of his fellow accountants at the firm, about the Bieglers' visit. Jessica Whitlock then called her accounting client Richard Kraft. Richard Kraft, already agitated over what had transpired at the auction, became increasingly upset and suspicious—mistakenly it turns out[3]— that Martin Biegler was inquiring into his own personal financial information.

After the call with his accountant, Richard Kraft returned to Aberle's office. Shortly after arriving there and early in his meeting with Aberle, Richard Kraft received a call on his cellular phone from Martin Biegler. Martin Biegler was so loud that Richard Kraft could hold the phone away from his ear to allow Aberle to hear what Martin Biegler was saying. Kraft told Biegler that he was with Aberle. Biegler responded that since Kraft was already "lawyered up," Biegler would do the same and that the next person Kraft would hear from would be the Bieglers' attorney.

---

[3] The Bieglers in fact did not ask for any financial information concerning the Krafts.

11

Martin Biegler also told Kraft that he could make this sale last as long as he wanted to. Richard Kraft responded by telling Biegler "to have fun."

The trust between the parties had broken down to the point where Christine Schirber thought it best to withdraw the $41,000 of earnest money deposited from her self-directed IRA. Christine Schirber called Craig DeJager, the trustee at BankWest, Inc., and advised him that there had been a major disagreement regarding the purchase of the home after the wire of the $41,000. BankWest, Inc. reversed the wire, with a notation "returned wire funds—customer requested that funds be returned because the purchase fell through." Exhibit 19. After that, Aberle sent an email to Christine Schirber describing his perspective on what occurred and concluding: "At this point, Richard and Caryn [Kraft] formally reject the bid submitted by you, Marty and Cara." Exhibit 20.

Richard Kraft then engaged Tyrone Kraft in negotiations for the sale of the property. The negotiations culminated in the sending of a draft purchase agreement, warranty deed, and notice of purchase agreement by Aberle to the attorney for Tyrone Kraft on May 24, 2011. Close in time to that date, Bud Schirber called Richard Kraft, apologized for any offense caused to the Krafts, and offered to pay the additional $18,000 to resuscitate the purchase agreement between the Krafts and the Bieglers. Richard Kraft told Bud Schirber that he needed to think about the proposal and would call him back. Richard Kraft called Bud Schirber back shortly afterwards and declined to accept the additional $18,000 to consummate a purchase agreement with the Bieglers.

The Krafts then signed a purchase agreement with Tyrone Kraft setting the purchase price at $375,000, with the value of the home being $234,000. Doc. 38 at 19-20, ¶¶ 72, 74. The reduction in the value of the home from $250,000 to $234,000 was done on close to what is a prorated basis. That is, when the Krafts selected $250,000 as the value of the home, the high bid was $397,500. The purchase price of $375,000, to be paid by Tyrone Kraft, was approximately

6.5 percent below that. The reduction of home value from $250,000 to $234,000 is a reduction of approximately 6.5 percent. The purchase agreement entered into between the Krafts and their nephew Tyrone contained the following provision:

> The parties to this agreement specifically acknowledge that a threat of litigation has been made by Martin Biegler to force [the Krafts] to sell the above described property to Martin and Cara Biegler and the self-directed IRA of Kristi Schirber (hereinafter referred to as "Bieglers"). The parties to this agreement have decided to proceed with the sale based upon the agreement of the parties that [the Krafts] shall have the right to repurchase this property from [Tyrone Kraft] for the original purchase price in the event specific performance is ordered by a court of competent jurisdiction or if it appears that monetary damages may be granted to Bieglers.

Doc. 38 at 19, ¶ 73.

On May 26, 2011, the Bieglers filed this lawsuit and a lis pendens. Due to the filing of the lis pendens, the sale to Tyrone Kraft has not occurred, although Tyrone Kraft has been living in the home in question. The Krafts have lost the opportunity to protect a portion of the sale price from being taxed as a capital gain, because they have not resided at the home now for over three years.

## II. Conclusions of Law

This Court has diversity jurisdiction over this case under 28 U.S.C. § 1332, because there is complete diversity citizenship between the South Dakota Plaintiffs and the Alaska Defendants and more than $75,000, exclusive of interest and costs, are at issue here. South Dakota law governs this dispute over property within South Dakota.

### A. South Dakota Statute of Frauds Issue

#### 1. SDCL § 53-8-2

The Krafts have raised as a defense the South Dakota statute of frauds, South Dakota Codified Laws ("SDCL") § 53-8-2. That statute, in relevant part, provides:

> The following contracts are not enforceable by action unless the contract or some memorandum thereof is in writing and subscribed by the party to be charged or his agent, as authorized in writing:
>
> . . .
>
> (3) An agreement for sale of real estate or an interest therein . . . . However, this does not abridge the power of any court to compel specific performance of any agreement for sale of real estate in case of part performance thereof . . . .

SDCL § 53-8-2. This Court previously has analyzed the application of that statute to this case, as well as addressing and rejecting the Bieglers' claim of "part performance." Although it duplicates this Court's prior Opinion and Order Granting in Part and Denying in Part Motion for Summary Judgment, this Court will repeat some of the analysis concerning SDCL § 53-8-2.

The Supreme Court of South Dakota has explained what writing is necessary to satisfy this portion of the statute of frauds. In <u>Amdahl v. Lowe</u>, 471 N.W.2d 770 (S.D. 1991), the Supreme Court of South Dakota stated:

> The statute of frauds requires that contracts for the sale of land must not only be in writing and signed by the party who is to be charged, but the writing must contain all the material terms and conditions of the oral agreement between the parties. To satisfy the statute of frauds, a memorandum for the sale of land must describe the land, the price, and the contracting parties; it need not detail the form or delivery of deed, the time and place of payment, or any other matters. The statute of frauds requires only that the writing evidence the substance of the contract. There is no fatal ambiguity if the contract terms are sufficiently certain to make the acts required of each party clearly ascertainable.

<u>Id.</u> at 774-775 (citations omitted); <u>see also</u> <u>LaMore Rest. Gp., LLC v. Akers</u>, 2008 SD 32, ¶ 15, 748 N.W.2d 756, 761.

The "purpose of the statute is to remove uncertainty by providing written evidence of an enforceable obligation," but the statute of frauds is not to "be used to work an injustice." Jacobson v. Gulbransen, 2001 SD 33, ¶ 26, 623 N.W.2d 84, 90 (citations omitted) (internal quotation marks omitted). Accordingly, "[t]he agreement itself need not be the writing relied upon, a memorandum evidencing the obligation is sufficient." Wiggins v. Shewmake, 374 N.W.2d 111, 114 (S.D. 1985) (citing SDCL § 53-8-2). That is, "any memorandum that reasonably identifies the subject matter of the action and is signed by the party to be charged will satisfy the statute's writing requirement." Northstream Invs., Inc. v. 1804 Country Store Co., 2005 SD 61, ¶ 17, 697 N.W.2d 762, 766.

However, neither the Krafts nor their attorney signed any purchase agreement with the Bieglers. SDCL § 53-8-2 expressly states that a contract within the scope of that provision is "not enforceable by action unless the contract or some memorandum thereof is in writing and subscribed by the party to be charged or his agent." The South Dakota Supreme Court has equated the word "subscribed" with "signed." See Amdahl, 471 N.W.2d at 774 ("[c]ontracts for the sale of land must . . . be in writing and signed by the party who is to be charged . . . ."); Northstream Invs., 2005 SD 61 at ¶ 17, 697 N.W.2d at 766 (noting any memorandum may satisfy the statute of frauds if it "is signed by the party to be charged"). In today's electronic world, there may be ways of satisfying the requirement of a contract to be "subscribed," other than by an actual physical signature. Tolle v. Lev, 2011 SD 65, at ¶ 13, 804 N.W.2d 440, 444-45 (holding that a confirmation e-mail was a "subscribed" contract that satisfied the statute of frauds). Although there was a written contract under negotiation that would have satisfied the statute of frauds, neither the Krafts nor their agent signed that purchase agreement or any other such writing.

The Bieglers nevertheless have contended that the documents surrounding the two-phase auction—the bill of sale advertising the auction, information of a similar nature on a website, and

15

ultimately the proposed and unsigned purchase agreement—satisfy the writing requirement. This material identifies the land and contracting parties and other details. There is no dispute that the high bid at phase two of the auction was $410,000, albeit with an issue remaining about how much of that purchase price would be allocated to the value of the home on the property. However, the fact that most of the terms of the proposed purchase of real estate can be pieced together from memoranda and parol statements does not satisfy the requirement of SDCL § 53-8-2 that there be some writing "subscribed by the party to be charged or his agent."

### 2. Part Performance

The Bieglers have argued that SDCL § 53-8-2(3) is satisfied because of "part performance" and the operation of promissory estoppel. SDCL § 53-8-2(3) indeed recognizes that a court may compel specific performance of a real estate agreement rendered unenforceable under the statute of frauds if there is "part performance thereof." The Bieglers asserted that they engaged in part performance by having a portion of the earnest money wire-transferred to the Krafts' account and negotiating for changes to the draft purchase agreement. The Bieglers also were prepared to write a check for the remainder of the earnest money, but Richard Kraft refused to accept such a check due to the parties' disagreement over how much of the purchase price to allocate to the value of the home.

The Supreme Court of South Dakota in Durkee v. Van Well, 2002 SD 150, 654 N.W.2d 807, considered what conduct amounted to "part performance" under SDCL § 53-8-2(3). Id., 2002 SD 150 at ¶¶ 23-28; 654 N.W.2d at 815-16. In Durkee, the Van Wells acquired property in 1975 adjacent to property owned by the Durkees. Id., 2002 SD 150 at ¶¶ 1-2; 654 N.W.2d at 810-11. Through a survey completed prior to the purchase of the property, the Van Wells learned that a boundary fence between the two properties was located 35 feet off of the actual boundary line to

the benefit of the Durkees. Id. The Van Wells discussed the situation with the Durkees, and the Van Wells and Durkees reached an oral agreement. Id. Under the oral agreement, the Durkees would be allowed continued use of the strip of property on their side of the fence that was part of what the Van Wells thought they were buying, the Van Wells would pay the entire property tax for the property, and when it became necessary to replace the fence, the Van Wells would remove the old fence and place a new fence at the actual boundary with the Van Wells and Durkees splitting the cost of the new fence. Id., 2002 SD 150 at ¶ 3, 654 N.W.2d at 811. In 2000, the Van Wells removed the original fence and began constructing a new fence on the surveyed property line. Id., 2002 SD 150 at ¶¶ 4-5, 654 N.W.2d at 811. After the new fence was almost half done, the Durkees sued to enjoin the Van Wells from relocating the fence and asserted ownership of the disputed 35-foot strip of land by adverse possession. Id. After a court trial, the court concluded that both promissory estoppel and partial performance took the case out of the application of the statute of frauds. Id., 2002 SD 150 at ¶ 6, 654 N.W.2d at 811-12. The Supreme Court of South Dakota affirmed, noting that, in reliance on the agreement, the Van Wells had partially performed by leaving the fence in its existing location, allowing the Durkees continued use of the property, maintaining the fence through the years, paying property taxes for the disputed strip of land, removing the old fence, and constructing almost half of a new fence before the Durkees objected. Id., 2002 SD 150 at ¶ 28, 654 N.W.2d at 816.

By contrast with Durkee, the Bieglers' alleged part performance consisted of a wire transfer of approximately two-thirds of the earnest money deposit which Christine Schirber reversed later that same day, attempting to pay the remainder of the earnest money deposit which Richard Kraft refused to accept, and negotiating certain terms of a purchase agreement without reaching an agreement on the amount of the purchase price to assign to the house. Yet, if an agreement for sale

17

and purchase of the property existed between the Bieglers and the Krafts, the Bieglers' performance

ultimately would consist of paying the $410,000 purchase price, and the Krafts' obligation would

be to transfer the property to the Bieglers. If the Bieglers had paid the earnest money in full or not

cancelled the wire transfer, and if the Krafts had retained the earnest money, this might be a

different case. However, with the Bieglers having reclaimed all of the partial payment of earnest

money, the doctrine of part performance does not spare the Bieglers' claims from the operation of

SDCL § 53-8-2(3). See also Williams v. Denham, 162 N.W.2d 285, 288 (S.D. 1968) ("Even

payment of part of the purchase price is not sufficient in itself to take a case out of the operation

of the Statute of Frauds.").

### 3. Promissory Estoppel

The Bieglers also claim promissory estoppel, an issue on which this Court found there to

be a question of fact. Promissory estoppel is a recognized exception to the operation of the statute

of frauds, because the statute of frauds is not designed to work an injustice. Durkee, 2002 SD 150

at ¶ 21, 654 N.W.2d at 814-15; Jacobson, 2001 SD 33 at ¶¶ 25-27, 623 N.W.2d at 90-91; In re

Estate of Gosmire, 331 N.W.2d 562, 567 (S.D. 1983). Thus, "[a]n oral promise to convey real

property is enforceable by specific performance where the grantee . . . has acted in reliance upon

the promise of the grantor in such a manner that it would invoke a fraud or prejudice against the

grantee not to grant specific performance thereon." In re Estate of Gosmire, 331 N.W.2d at 567.

In Jacobson, the Supreme Court of South Dakota characterized the elements of promissory

estoppel as a "promise which the promissor should reasonably expect to induce action or

forbearance on the part of the promisee or a third person and which does induce such action or

forbearance." Jacobson, 2001 SD 33 at ¶ 27, 623 N.W.2d at 91 (citation omitted). Such a promise

becomes binding "if injustice can be avoided only by enforcement of the promise." Id. (citation omitted).

The Bieglers point to Aberle's statements made just before the second phase of bidding that led the Bieglers to believe the Krafts would negotiate with the successful bidder on a proper allocation of the value of all structures on the property. Although Aberle appears to have stopped short of pledging that the $250,000 valuation for the residence was negotiable, his words implied to the Bieglers that the Krafts would work with the high bidder toward allocating a reasonable amount for the value of the house, land, and other structures following the second phase of the auction. All parties moved forward with phase two of the bidding, despite knowing that an issue about the proper valuation of the residence remained. The Bieglers' bid of $410,000 was made in reliance on their belief that the Krafts would agree to some reduction in the amount of the purchase price allocated for the home. However, the Bieglers did not condition their bid on the valuation of the home at $130,000 until the competition for the purchase of the home—Chip and Rita Long—had left Aberle's office.

Under these circumstances, there is what this Court would consider a vague promise—that the Krafts may negotiate with the successful bidder on the proper allocation of the value assigned to the home, structures, and land. The vague promise is one that the Krafts could expect to induce action, bids in reliance on the statement, but could not expect to induce a bidder to believe that the bidder could unilaterally supply his own value for the residence. The vague promise did result in a bid of $410,000 from the Plaintiffs. As this Court noted in denying summary judgment to the Krafts previously, "this, however, leaves open the question whether 'injustice can be avoided only by enforcement of the promise' and a related question of whether an alleged breach of a promise to negotiate in good faith support specific performance, and, if so, on what terms." Biegler v.

Kraft, CIV 11-3010-RAL, 2012 WL 2915515, at *7 (D.S.D. July 17, 2012) (citing Jacobson, 2001 SD 33 at ¶ 27, 623 N.W.2d at 91).

This Court, on summary judgment, had to view the facts in the light most favorable to the nonmoving party, the Bieglers. However, promissory estoppel is in the nature of an affirmative defense to the application of the statute of frauds where the Bieglers carry the burden of proof by a preponderance of the evidence at trial. See 56 A.L.R.3d 1037; 61A Am. Jur. 2d Pleading § 303. The Bieglers have not met their burden of proof by a preponderance of the evidence on the elements of promissory estoppel. First, there is a problem with relying on this sort of promise. Aberle's words left the Bieglers with the impression that the value of the home could be negotiated after phase two of the auction, but the promise was less than direct. In submitting their bid, the Bieglers, even knowing that the valuation of the home was very material to them, did not condition the bid of $410,000 on a valuation of the home at $130,000 or at any other number. This Court does not doubt that Aberle and Richard Kraft were trying to finesse the issue and to stick with a valuation of $250,000 for the residence. However, the promise here induced an action—a bid in reliance on a supposition that the value of the home was negotiable—that is not of the nature where "injustice can be avoided only be enforcement of the promise." See Jacobson, 2001 SD 33 at ¶ 27, 623 N.W.2d at 91. Indeed, although it was tepid negotiating, the Krafts made a proposal under which they would accept a $130,000 valuation of the home, albeit by having the Bieglers pay to the Krafts an extra amount approximating the adverse tax ramifications. Although Martin Biegler found the proposal both unacceptable and offensive, it nevertheless was a counter-proposal to the Bieglers' desire to have the valuation of the home set at $130,000. Even when discussion became so testy that no agreement that day was likely, Aberle on behalf of the Krafts agreed to provide Christine Schirber with a written proposal by email. That written proposal never materialized,

because Richard Kraft chose to abandon further negotiations with the Bieglers based on the mistaken belief that Martin Biegler was prying into his finances at Krafts' accounting firm and a subsequent argument over the phone during which Martin Biegler seemed to threaten a lawsuit. The Bieglers did not negotiate further that day, and only after about two weeks passed did Bud Schirber attempt to restore the deal on his own. The doctrine of promissory estoppel does not support enforcing a vague promise to negotiate a key term when the parties' efforts, tepid as they were, to do so blew apart the entire transaction.

### 4. Auction Exception

The Bieglers maintain their alleged agreement with the Krafts to buy the land is enforceable notwithstanding SDCL § 53-8-2, because the sale was through an auction thereby making SDCL § 53-8-4 applicable. SDCL § 53-8-4 provides:

> When a sale is made by public auction of any real or personal property, an entry by the auctioneer, or actual clerk of the sale, in his sale book at the time of the sale, of the kind of property sold and description thereof sufficient for identification, the terms of sale, the price, and the names of the purchaser and person on whose account the sale was made, is a sufficient memorandum to satisfy the requirements of § 53-8-2.

SDCL § 53-8-4. The Krafts were attempting to sell the land in question by a two-phase public auction with Aberle serving as the auctioneer. There was no formal sale book, but a draft purchase agreement set forth most of the terms of sale, the price of $410,000 as the high bid in the second phase apparently was recorded, and the identity of prospective purchasers was apparent. Although this Court addressed these issues at length in the Opinion and Order Granting in Part and Denying in Part Motion for Summary Judgment, repetition of part of the analysis here is helpful. Biegler, 2012 WL 2915515, at *8-10.

There is a dearth of authority in South Dakota on what actions during an auction are sufficient to remove a case from the statute of frauds. SDCL § 57A-2-328, a provision of the Uniform Commercial Code that applies to transactions in goods and not to real estate sales, refers to a sale by auction being complete "when the auctioneer so announces by the fall of the hammer or in some other customary manner." Although less than completely clear at this stage what Aberle said, his comments following receipt of the Bieglers' $410,000 bid were sufficient to cause the unsuccessful bidders—the Longs—to congratulate the Bieglers and leave the building. There was no formal "fall of the hammer," but there was communication about the Bieglers having the high bid and the need to proceed to discuss completion of the purchase agreement.

The Bieglers previously asserted that, because the sale was by auction and they were the high bidder, they thereby have a binding contract without any issue under the statute of frauds. Such an argument would prevail if the Krafts had sold the property at an "absolute auction." An "absolute auction" is "an auction in which the property is sold to the highest qualified bidder with no limiting conditions or amount." S.D. Admin. R. 20:69:06:01.01(2). When there is an "absolute auction," sometimes called an "auction without reserve," the seller is making an offer to sell with no reservation or conditions, and the bid reflects acceptance of that offer. See Washburn v. Thomas, 37 P.3d 465, 467 (Colo. App. 2001); Pyles v. Goller, 674 A.2d 35, 40 (Md. Ct. Spec. App. 1996); Pitchfork Ranch Co. v. Bar TL, 615 P.2d 541, 548-49 (Wyo. 1980); 7 Am. Jur. 2d Auction and Auctioneers § 17.

The Krafts, however, were not selling their property at an absolute auction. Rather, the bid sheet advertising the auction specifically stated:

> Sellers reserve the right to reject any and all bids. Any announcements made day of auction supersede any and all previously printed material and any other oral statements made.

Exhibit 1. The Krafts thereby were offering the property through some form of an "auction with reserve," which is "an auction in which the seller or seller's representative retains the right to establish a minimum price, to accept or decline any and all bids or to withdraw the property at any time prior to the announcement of the completion of the sale by the auctioneer." SD Admin. R. 20:69:06:01.01(3). Thus, the Krafts retained the right to choose not to sell the property at least up to the time of the completion of the sale by the auctioneer. See Pyles, 109 Md. App. at 81-82; 7 Am. Jur. 2d Auctions and Auctioneers § 17. Although the Uniform Commercial Code does not apply to a sale of real estate, SDCL § 57A-2-328(3) codifies prevailing law in stating that an auction sale "is with reserve unless the goods are in explicit terms put up without reserve. In an auction with reserve the auctioneer may withdraw the goods at any time until he announces completion of the sale." See also Young v. Hefton, 173 P.3d 671, 675 (Kan. 2007) (noting that the U.C.C. provision in real estate sale issue is "instructive although not technically applicable"); Pyles, 109 Md. App. at 81 ("The presumption in contract law is that auctions are held 'with reserve' unless otherwise specified."); 7 Am. Jur. 2d Auction and Auctioneers § 17. An auction with reserve is an invitation for bids, with each bid constituting an offer that may be accepted by the seller. See Young, 173 P.3d at 676. Typically in an auction with reserve, the contract forms when the auctioneer closes the bidding, customarily by a fall of the hammer or some other recordation and notification of the high bidder of the acceptance of the bid. Id.

Some authority recognizes another type of auction, a "conditional" auction, although such an auction seems to be a type of an auction with reserve. See Restatement (Second) of Contracts § 28 and cmt. b. and d. (1981 & Supp. April 2012) (recognizing "auction without reserve" and "auction with reserve"). In such a "conditional auction," a seller reserves the right to accept or reject bids even after the close of bidding. Young, 173 P.3d at 676-77; Washburn, 37 P.3d at 467

23

(holding that sellers could reject a final bid after the auction was closed on a real estate auction because the auction was conditional). For an auction to be conditional, "the conditions must be effectively communicated to prospective bidders." Young, 173 P.3d at 677; see also Cuba v. Hudson & Marshall, Inc., 445 S.E.2d 386, 387-88 (Ga. Ct. App. 1994); East v. Brown, 986 P.2d 523, 525 (Okla. Civ. App. 1999); Coleman v. Duncan, 540 S.W.2d 935, 937 (Mo. Ct. App. 1976). Here, just before the second phase of the auction commenced, Aberle, acting as an agent of the Krafts, made a statement to the effect that, after the bidding, there would be more negotiation of assignment of purchase price to aspects of the property. The bill of sale had disclosed that "any announcements made day of the auction supersede any and all previously printed material and any other oral statement made." Exhibit 1. The bill of sale also stated: "Sellers reserve the right to reject any and all bids." Exhibit 1.

The Bieglers now acknowledge that the Kraft land auction was with reserve, but argue that the hammer of auctioneer Aberle effectively fell rendering the Bieglers the winning bidders and that SDCL § 53-8-4 and the law regarding auctions with reserve results in an enforceable contract. In an auction with reserve, "the point at which the seller legally 'accepts' the potential purchaser's bid (thus entering into a contract of sale with the bidder) is less clear." Cuba v. Resolution Trust Corp., 849 F. Supp. 793, 796 (N.D. Ga. 1994). This Court thus found there to be a question of fact both over whether the auction was a conditional auction where the Krafts reserved the right to reject bids after the auction and whether, if not such a conditional auction, there was enough written or done such that SDCL § 53-8-4 renders any agreement enforceable under the statute of frauds.

Ideally, the bill of sale for such a land auction as this that is with reserve and conditional should have stated something to the effect that "sellers reserve the right to reject any and all bids

24

*until the purchase agreement for the property is signed following the second phase of bidding.*"

The bill of sale here did disclose that announcements the day of auction "supersede any and all previously printed material and any other statement made." Exhibit 1. In this case, there was an announcement, or perhaps more accurately an implication, that following the second phase of bidding there would be negotiation over values to be assigned to the home, structures, and land. The Bieglers knew that the Krafts' position in the negotiation over the value of the home began at $250,000. The Bieglers entered a bid conditional on not only that negotiation occurring, but also on the value to be assigned to the home of at or near $130,000.

The fact that the Bieglers' bid was conditional on a value of the home acceptable to them is evident by the fact that the Bieglers walked away without an agreement and withdrew the partial payment of the earnest money deposit. Granted, the negotiation by the Krafts was tepid, but the negotiations in which Martin Biegler engaged were not significantly better. While Bud Schirber proposed a rational alternative of an independent appraiser and Christine Schirber remained open to receiving an email with some alternative proposal, there is little doubt that the Bieglers' bid remained conditional on a valuation for the home for less than $250,000. All parties understood before phase two of the auction that they would need to work through a purchase agreement to arrive at a signed document. While the bill of sale could have been more direct in disclosing that, the statements by Aberle before the second phase of the auction conveyed that there would have to be discussion and agreement on matters in the purchase agreement. Under the circumstances, this Court cannot conclude that there was either a literal or proverbial "fall of the hammer," by which the Bieglers were assured of the purchase of the property absent resolution of terms in the purchase agreement. The Bieglers' own bid was conditional on an acceptable valuation of the home, and the auction was an auction with reserve and conditional in nature.

## B. Meeting of the Minds

The Krafts also argue that there was no meeting of the minds on all essential terms as a matter of law. In particular, the Krafts point to what they characterize as the "price" term, which the Krafts argue to include how much of the $410,000 purchase price to allocate to the value of the home. This Court addressed this argument previously and found there to be a question of fact but will repeat in part its analysis. Biegler, 2012 WL 2915515, at *10-11.

Under South Dakota law for a contract to exist, "there must be a meeting of the minds or mutual assent on all essential terms." Jacobson, 2001 SD 33 at ¶ 22, 623 N.W.2d at 90; Read v. McKennan Hosp., 2000 SD 66 at ¶ 23, 610 N.W.2d 782, 786. That is, if the parties leave open essential terms to negotiate in the future, then a contract is not established. Weitzel v. Sioux Valley Heart Partners, 2006 SD 45 at ¶ 23, 714 N.W.2d 884, 892; Werner v. Norwest Bank SD, N.A., 499 N.W.2d 138, 142 (S.D. 1993). Put in other words, if the parties have just an agreement to agree, contemplating negotiation in the future on an essential term, there is no enforceable contract. Weitzel, 2006 SD 45 at ¶ 23, 714 N.W.2d at 892.

The existence of a valid contract is a question of law to be determined by the court. Weitzel, 2006 SD 45 at ¶ 22, 714 N.W.2d at 892; Werner, 499 N.W.2d at 141. Consent to contract likewise is a question of law in South Dakota for the court. LaMore Rest., 2008 SD 32 at ¶ 15, 748 N.W.2d at 761. However, under South Dakota law, "whether the parties had such a meeting of the minds [to form a contract] is a question of fact." Jacobson, 2001 SD 33 at ¶ 22, 623 N.W.2d at 90; see also Behrens v. Wedmore, 2005 SD 79 at ¶ 21, 698 N.W.2d 555, 566 (noting that whether the parties' intent and conduct established a binding agreement generally is a fact question). Whether a term of an alleged contract is essential to the parties can be a mixed question

of law and fact. See LaMore Rest., 2008 SD 32, ¶ 17, 748 N.W.2d at 762 (discussing what constitutes a "material term" of a contract).

Here, the "price" term, in the sense of the overall price for the property, was established through the bid process as $410,000. However, the parties dispute whether a related term—the amount of the purchase price to be allocated to the home—was an essential term on which the parties failed to agree. The conduct of the parties demonstrates the importance of the term, in that the Krafts wanted the Plaintiffs to pay $18,000 over the purchase price in order to accommodate the Bieglers' request for valuing the home at $130,000, and the Bieglers at the time of the second phase of the auction would not carry through with the purchase of the property at the price of $410,000 if the amount allocated to the residence was $250,000.[4] Indeed, to preserve their internal agreement to allocate the $410,00 cost of the property two-thirds to the IRA and one-third to Martin and Cara Biegler, the Bieglers could not have the value of the residence exceed $139,000. Discussion over the appropriate value to allocate to the home quickly led to a tense and agitated discussion from Martin Biegler on the one hand and Richard Kraft and Aberle on the other. There was no prior animosity whatsoever among Martin Biegler, Richard Kraft, and Aberle, yet discussion of the appropriate price to assign to the home quickly led to hard feelings that persisted and were evident during the court trial. Following that discussion, Richard Kraft refused to accept a check for the remaining earnest money deposit and Richard Kraft and Aberle declined to negotiate further, shortly thereafter the IRA withdrew the wire transfer of roughly two-thirds of the earnest money understanding that the negotiation had failed to produce an agreement, and

---

[4] Bud Schirber later called Richard Kraft to offer to pay the additional $18,000, but by that time Aberle had sent an email rejecting the bid and the Krafts had progressed toward selling the home to their nephew on different terms.

before the day was out Martin Biegler communicated to Richard Kraft that he was planning to "lawyer up" as Kraft had done and to sue. The circumstances of this case plainly demonstrate that the allocation of the value to the home was an essential term on which there was no meeting of the minds.

The Bieglers' Complaint sought specific performance, which is the remedy under South Dakota law to enforce an alleged agreement for the purchase of real property. <u>Amdahl</u>, 471 N.W.2d at 773; SDCL § 21-9-9. Specific performance is an equitable remedy. <u>McCollam v. Cahill</u>, 2009 SD 34, ¶ 15, 766 N.W.2d 171, 176. Among the problems with requiring specific performance under the circumstances of this case is that this Court would have to arrive at the appropriate valuation of the home, thereby supplying an essential term on which the parties could not agree. Neither party presented any written appraisal of the home or testimony from any appraiser. To arrive at a proper valuation of this home, this Court would have to engage in speculation regarding just what land or out-buildings Martin and Cara Biegler would have received relative to the IRA and what value the land, home, and other buildings separately had. Specific performance is not appropriate under the circumstances of this case.

### C. Slander of Title Counterclaim

The Krafts filed a counterclaim for slander of title based on the Bieglers filing a lis pendens in connection with this lawsuit. SDCL § 43-30-9 allows a slander of title claim and states:

> No person shall use the privilege of filing notices hereunder for the purpose of slandering the title to land and in any action brought for the purpose of quieting title to land, if the court shall find that any person has filed a claim for the purpose only of slandering title to such land, he shall award the plaintiff all of the costs of such action, including attorney fees to be fixed and allowed to the plaintiff by the court, and all damages that plaintiff may have sustained as the result of such notice of claim having been filed for record.

28

SDCL § 43-30-9. The Supreme Court of South Dakota has recognized that this statute "does not

indicate a legislative intent to allow a court to award attorney's fees in a slander of title action when

the slander does not result in a quiet title action under SDCL ch. 21-41." Brown v. Hanson, 2011

SD 21, ¶ 34, 798 N.W.2d 422, 431.

The first nineteen words of SDCL § 43-30-9 and case law in South Dakota recognize a

slander of title claim apart from a quiet title action. The elements of such a claim in South Dakota

are that the party claiming slander of title must show that:

> [T]he publication was false and that the publication "(1) was
> derogatory to the title to [the] property, its quality, or [the property
> owner's] business in general, calculated to prevent others from
> dealing with [the property owner] or to interfere with [the property
> owner's] relations with others to [the property owner's]
> disadvantage (often stated as malice); (2) was communicated to a
> third party; (3) materially or substantially induced others not to
> deal with [the property owner]; (4) resulted in special damage."

Brown, 211 SD 21, ¶ 19, 798 N.W.2d at 428 (quoting Gregory's, Inc. v. Haan, 1996 SD 35, ¶ 12,

545 N.W.2d 488, 493). The threshold question, therefore, is whether the lis pendens contained

false statements. Id.

The lis pendens filed in this case described the property, gave notice of this pending lawsuit

and stated that "the object of the pending action is, inter alia, to obtain specific performance of the

sale of the real property" to the Bieglers. Doc. 3. The lis pendens was brief and in no way "false"

as required for a slander of title claim in South Dakota law. See Brown, 2011 SD 21, ¶ 19, 798

N.W.2d at 428; Gregory's, Inc., 1996 SD 35, ¶ 12, 545 N.W.2d 488, 493. The Bieglers are not

entitled to specific performance as sought in their Complaint, but there was a fact issue in this case

that prevented this Court from granting summary judgment or judgment as a matter of law. See

Biegler, 2012 WL 2915515, at *10-1. Under the circumstances, the Krafts have not met their

29

burden of proof to establish that the necessary elements of a slander of title claim.  <u>Brown</u>, 2011 SD 21, ¶ 20, 798 N.W.2d at 428.

## III. Conclusion and Order

For the reasons explained, it is hereby

ORDERED that Judgment for the Defendants enter on Plaintiffs' Complaint.  It is further

ORDERED that Judgment for the Plaintiffs enter on Defendants' Counterclaim.

Dated February 7th, 2013.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE